Rebecca JOHNSON, Plaintiff,

v.

**FEDERAL EXPRESS CORP.,**
Defendant.

No. CIV. A. 00–D–354–N.

United States District Court,
M.D. Alabama,
Northern Division.

May 18, 2001.

David R. Arendall, Stephanie S. Woodard, Birmingham, AL, for Plaintiff.

Charles A. Powell IV, Shannon L. Miller, Constangy, Brooks & Smith, Birmingham, AL, Richard C. Paul, FedEx Corp., Memphis, TN, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is Defendant Federal Express Corporation's [1] Motion For Summary Judgment, which was filed March 15, 2001. Plaintiff Rebecca Johnson [2] filed a Response on April 6, and Defendant issued a Reply on May 1. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that the motion is due to be granted in part and denied in part.

### I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). The parties do not contest personal jurisdiction or venue.

### II. SUMMARY JUDGMENT STANDARD

The court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the mat-

1. "Defendant" or "FedEx."

2. "Plaintiff" or "Johnson."

ter," but solely determines whether there is more than "some metaphysical doubt" about whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted); *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. INTRODUCTION

FedEx fired Rebecca Johnson after a forensic document examiner found it was highly likely that Johnson sent management an anonymous note threatening to "come in here one day and shoot up this place." [3] Johnson, who was a customer service agent in Montgomery, Ala., had several other write-ups in her personnel file for insubordination, and another supervisor found Johnson fearsome. FedEx showed Johnson the door January 6, 2000. She alleges discrimination, violation of the Fair Credit Reporting Act, and a host of state law torts. Aside from her allegation of false imprisonment, every claim is due to be dismissed.

## IV. FACTUAL BACKGROUND

Johnson is a black female, who was directly supervised by three operations managers: Nick Ashner, Don Wilkerson, and Danny Patterson. Above them in the chain of command was senior manager Jannette Maye. Maye, in turn, reported to managing director Randy King. King reported to Scott Bunker, vice president for the southern region.[4]

The FedEx supervisors where Johnson worked received a series of apocalyptic messages and letters between July 1999 and January 2000. Perhaps coincidentally, Johnson's problems all came to a head during the same time frame. Johnson's first warning and 2–day suspension came down July 6, after she took a long lunch break at an inappropriate time and was disrespectful to supervisor Ashner when she returned.[5] While she was suspended, FedEx uncovered several flirtatious e-mails between Johnson and Wilkerson. The e-mails discussed private matters and suggested that the couple enjoyed an unusually close relationship, even though each individual had a spouse of his or her own.[6] After Johnson returned to work, Maye began receiving pager messages with phone numbers of local funeral homes and the number "666."[7] Maye believed Johnson sent the pages.

Maye was not the only supervisor who received disturbing, anonymous messages. A letter dated November 12 complained about Maye and Ashner and warned that "[s]ome one is going to come in here one-day and shoot up this place all because [Maye] and [Ashner] are abusive. OK, we're telling you all, when it happens, don't say we didn't warn you." FedEx believed Johnson sent the letter, as it was signed "Employees of MGM Station" and referred to certain events that hit close to home, including an affection for Wilkerson and a mistrust of Maye.[8]

FedEx hired forensic examiner Thomas Vastrick to review the letter. Once it became known that FedEx was taking the threats seriously, FedEx received two more anonymous notes that attempted to downplay things. FedEx's concerns were not allayed. The notes referenced meet-

---

**3.** King Aff. ¶ 3.

**4.** Mot. at 7; Resp. at 1–2.

**5.** Johnson's Dep. Ex. 6.

**6.** *Id.* Ex. 4.

**7.** Maye's Dep. at 80–84. In the Christian Bible, the number "666" symbolizes the Antichrist. *See Rev.* 13:16–18.

**8.** Johnson's Dep. Ex. 11 at 3; Mot. at 7–8.

ings with Montgomery employees and on-going occurrences at the Montgomery office, where Johnson worked. As a result, through a process of deductive reasoning, King became convinced that all three letters were penned by Johnson.[9] On December 17, Vastrick issued an independent report stating with a "high degree of probability" that Johnson wrote the initial threatening letter. Vastrick defined a "high degree of probability" as being "a near virtual certainty." [10]

FedEx's investigation took place around the same time that Johnson got a second write-up for insubordination. Supervisor Patterson determined that Johnson was rude to a co-worker and misrepresented comments that Patterson had made about the delivery of a package. Patterson hit Johnson with an unpaid 2–day disciplinary suspension beginning December 15.[11] Based on Vastrick's findings about the threatening letters, FedEx converted this suspension into an paid investigative suspension. FedEx continued to investigate, and Johnson met with FedEx's security personnel to discuss matters. Johnson continued to deny any involvement with the letters. King got fed up and fired her three weeks later.[12]

## V. DISCUSSION

█ Johnson brings three federal claims, and the court will exercise pendant jurisdiction over Johnson's three state claims. At the outset, the court finds that Johnson has abandoned her claim under the federal wiretap statute, 18 U.S.C. § 2510 et seq. The court also finds that summary judgment is due to be granted

on the federal claims because Plaintiff has not complied with the court's orders for citation to the record.

The burden is on the parties to designate *specific facts* within the record showing the presence of a genuine dispute for trial. *See* FED. R. CIV. P. 56(e). As the Uniform Scheduling Order makes clear, counsel must choose his specific facts and explain why the law supports his claim on the facts.[13] *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995). It is bad enough when counsel does not cite to the particular lines of depositions upon which he relies. It is much worse when counsel points blithely to blanket portions of the record (such as multi-page exhibits or documents) and invites the court to divine his intent. The invitation is not well taken.

The court has previously warned that "[s]hotgun pleadings are not allowed; a lawsuit is not a game of hunt the peanut." *Dinkins v. Charoen Pokphand*, 133 F.Supp.2d 1254, 1261 (M.D.Ala.2001). Because counsel has disregarded this warning, the court finds that Plaintiff's evidence has not been properly produced, and summary judgment is due to be granted. *See Pearson v. Prime Healthcare Corp.*, 2000 WL 33224801 at *4 (M.D.Ala.2000); *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 2000 WL 1785309 at *1 (M.D.Ala. 2000). For purposes of a more complete record, however, the court analyzes Plaintiff's federal claims below, with the Title VII discussion remaining unpublished.

9. King Aff. ¶¶ 14–15.

10. *Id.* ¶ 7; Vastrick Aff. ¶ 4; Mot. at 7–8.

11. Johnson's Dep. Ex. 14.

12. Mot. at 10.

13. The Uniform Scheduling Order states that "evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document. Failure to make such specific reference will result in the evidence not being considered by the court." (Doc. No. 5 § 3.)

## A. Fair Credit Reporting Act

Johnson's federal claim is that FedEx violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, when it collected her handwriting samples and sent them to Vastrick for comparison with the anonymous letters. Johnson contends that Vastrick is a "consumer reporting agency," that Vastrick's handwriting analysis is a "consumer report" or an "investigative consumer report," and that FedEx violated the statute by procuring the report and relying on it for "employment purposes" without complying with the statute's numerous notice-and-delay requirements. *See* 15 U.S.C. §§ 1681a(d)-(f), (h), 1681b(b), 1681d. The requirements are rather onerous. Among other things, employers must notify the employee that a report is being obtained, give her a copy of the report before taking any adverse employment action, and afford her adequate time to challenge the report's accuracy. *See id.* §§ 1681b(b), 1681d.

Johnson relies heavily on two advisory opinion letters written by Federal Trade Commission ("FTC") staff attorneys in 1999. Two citizens asked FTC to assume that an employer wished to investigate a charge of sexual harassment leveled against an employee. The issue presented was whether an investigatory report relying on company documents and conversations with employees, and compiled by an outside agency, constituted an "investigative consumer report," under FCRA. *Id.* § 1681a(e). The FTC letters, known as the Vail letter and the Meisinger letter, stated that an employer does, indeed, trigger the FRCA if it uses such information to take an adverse employment action. *See* FTC Vail Staff Op. Ltr. (April 5, 1999); FTC Meisinger Staff Op. Ltr. (Aug. 31, 1999).[14]

The letters are not binding and not persuasive. The ABA Section of Labor and Employment Law and other commentators have pointed out that the application of the FCRA's notice-and-delay provisions would undermine the efficiency and efficacy of employers' legitimate workplace investigations. *See* Theresa L. Butler, *The FCRA and Workplace Investigations*, 15 LAB. LAW. 391, 399–400 (2000); Kim S. Ruark, Comment, *Damned If You Do, Damned If You Don't?*, 17 GA. ST. U.L. REV. 575, 598–603 & n. 201 (2000). Moreover, FTC appears to have drawn a false analogy between employment decisions, by a present or prospective employer, based on information about a consumer's *general status* (such as credit, criminal or family history and the like) and a decision by a present employer about the consumer's *particular workplace conduct* (such as his threats of violence). Congress was not concerned with the latter, as evidenced by the bill's conference committee report, which excluded materials such as "protective bulletins issued by local hotel and motel associations" from the definition of "consumer credit report." H. REP. No. 91–975, *reprinted in* 1970 U.S.C.C.A.N. 4394, 4415. Employer investigations of specific workplace acts by their employees, like motel association bulletins about specific acts by their members, simply are of no import to Congress.

The court need not enter this thicket, however, to find that Johnson has offered no evidence that Vastrick is a "consumer reporting agency," or that Johnson's handwriting sample does not fall within FCRA's exception to its otherwise capacious definition of "consumer report." 15 U.S.C. §§ 1681a(d)(2).

---

**14.** Pl.Ex. 45–46. The letters are available at: *http://www.ftc.gov/os/statutes/fcra/vail.htm* and

*http: //www.ftc.gov/os/statutes/fcra/meisinger/htm.*

### 1. FCRA's statutory scheme

To prove her case, Johnson must show, at minimum, that: (1) Vastrick is a consumer reporting agency; and (2) Vastrick's report is a consumer report or investigative consumer report. The relevant parts of the statute are below.

FCRA defines a "consumer reporting agency" as:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, *regularly engages* in whole or in part in the practice of assembling or evaluating consumer credit information or other information on on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis supplied).

FCRA defines a "consumer report" as:

> any written, oral or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, *personal characteristics*, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... employment purposes.

*Id.* § 1681a(d)(1) (emphasis supplied).

FCRA defines an "investigative consumer report" as:

> a consumer report or portion thereof in which information on a consumer's character, general reputation, *personal characteristics*, or mode of living *is obtained through interviews with neighbors, friends, or associates of the consumer reported on* with whom he is acquainted or who may have knowledge concerning any such items of information.

*Id.* § 1681a(e) (emphasis supplied).

Because Johnson's handwriting is a "personal characteristic" under the FCRA, a report dealing with her handwriting potentially implicates the statute unless the report falls within the statute's exception to "consumer reports." The FCRA specifically provides that "the term 'consumer report' *does not* include any report containing information solely as to transactions or experiences between the consumer and the person making the report." *Id.* § 1681a(d)(2)(A)(i) (emphasis supplied).

Vastrick's report obviously is not an "investigative report." Although the report was used in FedEx's investigation into possible workplace violence, Vastrick states that he was hired only to analyze Johnson's handwriting. No evidence shows that he interviewed any of Johnson's neighbors, friends, or associates.[15] Thus, the only issue is whether the report was a standard "consumer report." *See Ditty v. CheckRite, Ltd.*, 973 F.Supp. 1320, 1333 (D.Utah 1997) (unsupported allegations are legally insufficient in FCRA context).

In the Vail letter, an FTC staff attorney stated that "once an employer turns to an outside organization for assistance in investigation of harassment claims ... the assisting entity is a [consumer reporting agency] because it furnishes 'consumer reports' to a 'third party' [the employer]." The Meisinger letter reaffirmed Vail. Johnson beseeches the court to follow these two opinions.

If the letters were rules, and if FTC had rulemaking authority, the court would defer to the agency. *See Chevron USA, Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But

---

**15.** Vastrick Aff. ¶¶ 2, 5.

Congress has not granted such authority, and serious separation-of-powers issues arise when courts blindly follow informal opinion letters. As commentators have explained:

> Congress has not delegated to any agency the power to make decisions that bind courts and citizens through formats like letters, manuals, guidelines, and briefs. No court should allow an agency to bind citizens or courts by applying *Chevron* step two to agency policy decisions announced in formats Congress has not authorized for that purpose. Statements in such informal formats may not even represent the agency's original choice of policies.

1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW § 3.5 at 120 (3d ed.1994). Thus, the court must independently interpret the FCRA's provisions.

### 2. Statutory interpretation

Although Congress amended the FCRA in 1996 and 1998, the operative definitions regarding "consumer reports" and "consumer reporting agencies" have not materially changed over the past thirty years. FCRA was preceded by the Consumer Credit Protection Act, which was heavily amended by Title VI of the Bank Records and Foreign Transactions Act of 1970. *See* H.R. 15073 (1970), *reprinted in* 1970 U.S.C.C.A.N. 1301, 1316–27; H. REP. No. 91–975, *reprinted in id.* 4394, 4414–16. The 1970 Act primarily addressed the problems of offshore banking and money laundering; Congress inserted the provisions dealing with credit reports at a conference committee meeting following the House and Senate votes. *See id.* at 4411.

■ Statutory analysis begins with the statute itself. The FCRA is not concerned merely with protecting the nation's banking system, although this is one of the Act's purposes. *See* 15 U.S.C. § 1681(a)(1). Rather, using identical language in 1970 and 1998, Congress has found that some consumer reporting agencies play a vital role in assembling and evaluating information about the general public. FedEx argues that Vastrick's report cannot be a "consumer report" because it passes no judgment on Johnson's character, personal qualities, or creditworthiness. This argument proves too much. Not all credit reporting agencies make such determinations; many distribute data and nothing more. To the extent that consumer reports are used to make employment decisions, FCRA safeguards the "confidentiality, accuracy, relevancy, and proper utilization" of the information assembled. *Id.* § 1681(b); *see also Hodge v. Texaco, Inc.*, 975 F.2d 1093, 1095 (5th Cir. 1992) ("FCRA applies not only to credit reports, but also to reports of consumers' employment eligibility."); *Wiggins v. District Cablevision, Inc.*, 853 F.Supp. 484, 489 (D.D.C.1994) (statute protects individuals from inaccurate information in reports "used as a factor in determining the individual's eligibility for employment.")

■ Assuming, without finding, that Vastrick's handwriting analysis qualifies as a consumer report, it does not necessarily follow that FedEx violated the statute. FedEx argues that the report from Vastrick to FedEx falls within the statute's "transactions or experiences" exclusion in 1681a(d)(2)(A)(i). The court agrees with FedEx.

The FCRA's legislative history makes clear that the "transactions or experiences" provision exempts any report based on the reporter's first-hand experience of the subject, *i.e.*, the handwriting. Indeed, the bill was targeted mainly at insuring the accuracy of information furnished by third parties to credit reporters. *See* 142 CONG. REC. S. 11868–01, 11869–70 (Sept. 30, 1996) (Sen.Ford). Thus, within the banking industry, for example, the Act's cover-

age does not extend to first-hand "information about an individual with whom [the reporters] have had direct financial transactions." 1970 U.S.C.C.A.N. at 4414.

In applying the 1681a(d)(2)(A)(i) exception, the Fifth Circuit has held that a worker's urinalysis, authorized by the employer and performed by an outside chemist, fell within the exclusion because the test result derived from "first-hand experience in performing the tests on the urine sample, not on information gathered from outside sources." *Hodge,* 975 F.2d at 1096. The Eleventh Circuit and other courts have reached similar conclusions. *See Smith v. First Nat'l Bank of Atlanta,* 837 F.2d 1575, 1579 (11th Cir.1988) (bank report about lendee); *Melendez v. Citibank,* 705 F.Supp. 67, 69 (D.P.R.1988) (same); *Chube v. Exxon Chem. Am.,* 760 F.Supp. 557, 561–62 (M.D.La.1991) (random drug test); *Peller v. Retail Credit Co.,* 359 F.Supp. 1235, 1237 (N.D.Ga.1973) (polygraph test).

■ In this case, FedEx obtained several writing samples and sent them to Vastrick, who tested them first-hand and drew conclusions based on his personal knowledge therefrom. Johnson does not allege that FedEx doctored up the samples before passing them along, nor does she claim that Vastrick shared the information with anybody other than FedEx. Therefore, the report is based entirely on information supplied by the consumer, Johnson, and so Congress's interest in confidentiality, accuracy, and relevancy has been satisfied. Accordingly, the court finds that Vastrick's report is not a consumer report. *See Hodge, supra* at 1096.

Moreover, Johnson has not shown that Vastrick is a "consumer reporting agency." To establish this element, a plaintiff must show that the reporter "regularly engages" in assembling or evaluating "consumer credit information ... for the purpose of furnishing consumer reports to

third parties ...". 15 U.S.C. § 1681a(f). Because neither the FCRA nor its legislative history define the term "regularly," the court looks for guidance to the Fair Debt Collection Practices Act ("FDCPA"). Both the FDCPA and the FCRA have similar language, and both statutes protect consumers.

The FDCPA defines a "debt collector" as "any person ... who regularly collects or attempt to collect" debts owed to others. 15 U.S.C. § 1692a(6). In an erudite opinion, the Sixth Circuit recently unpacked the FDCPA's definition of the term "regularly." The court, quoting Black's Law Dictionary, stated that "[t]he term 'regularly' means 'at fixed and certain intervals, regular in point of time. In accordance with some consistent or periodical rule of practice.' The term 'regular' means 'usual, customary, normal or general.... Antonym of "casual" or "occasional." ' " *Schroyer v. Frankel,* 197 F.3d 1170, 1174 (6th Cir.1999) (internal citations omitted). Thus, the court concluded that a debt collector "must have more than an 'occasional' involvement with debt collection activities to qualify as a 'debt collector' under the FDCPA." *Id.* (citing *Mertes v. Devitt,* 734 F.Supp. 872, 874–75 (W.D.Wis.1990)).

*Schroyer's* analysis is persuasive. By regulating only those consumer reporting agencies who "regularly engage" in reporting, Congress opted for incomplete coverage of the industry. Therefore, the court holds that a consumer reporter must provide consumer reports as part of his usual, customary, and general course of business if he is to qualify as a "consumer reporting agency" under the FCRA. *See* 16 C.F.R. Pt. 600 App. at 498▴99 (2001). Only those agencies that "regularly engage" in consumer reporting play a "vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3).

Johnson states that FedEx has used Vastrick's services previously. Even so, FCRA's focus is not client-specific, but work-specific. Vastrick rarely evaluates consumer information for reporting purposes. He states that he is a forensic document examiner who:

> perform[s] forensic document analysis on behalf of various clients and entities, including criminal prosecutors, public defenders, police departments, civil attorneys, whether plaintiff or defendant, and corporations. Approximately 85–90% of my business involves either criminal matters or consultation in ongoing litigation matters. I do not regularly engage in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports. Less than 10% of my business relates in any way to matters of employment.[16]

The court need not determine precisely at what point under the FCRA an outside investigator becomes a reporting agency to find that Vastrick does not qualify. Reporting is not part of Vastrick's usual, customary, and general course of business; it is less than 10 percent of his work. On these facts, Johnson has not carried her summary judgment burden; Count Seven is due to be dismissed. *See Hodge*, 975 F.2d at 1097 (statute does not cover reporter who issued one report); *McIntyre v. Main Street and Main Inc.*, 2000 WL 33117274 at *5 (N.D.Cal.2000) (same for reporter who "very rarely" issued reports); *see also Schroyer*, 197 F.3d at 1176 (same under FDCPA for collector with 92.6% of caseload involving matters other than debt collection).

### B. State Claims

■ Because Johnson's federal claims are due to be dismissed, the court has the discretion to decline ruling on her three state law claims. Johnson alleges defamation, outrageous conduct, and false imprisonment. Because the first claim potentially implicates precious First Amendment liberties, the court will keep this case. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (balancing test).

The First Amendment fundamentally protects individual self-realization. Free speech furthers intrinsic and instrumental values for speakers and listeners. It is a powerful checking force against arbitrary government, and it is from this freedom that all others follow. Sadly, state regulations of speech historically have been thinly-disguised veils for suppression. *See, e.g., Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), *rev'g* 281 Ala. 542, 206 So.2d 348 (1967) (parade permits); *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), *rev'g* 273 Ala. 656, 144 So.2d 25 (1962) (defamation); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), *rev'g* 265 Ala. 349, 91 So.2d 214 (1956) (membership lists). *But see Butler v. Alabama Jud'l Inq. Comm'n*, —— So.2d —— (Ala.2001), *concurring with district court's findings in questions certified by* 245 F.3d 1257 (11th Cir.2001), *appeal from* 111 F.Supp.2d 1241, 1253–54 (M.D.Ala.2000) (DeMent, J.) (issuing preliminary injunction; finding substantial likelihood of success in overbreadth challenge to state regulations of political speech by judges). Against this backdrop, the court holds that federal courts should exercise supplemental jurisdiction over defamation cases absent significant reasons to the contrary.

### 1. Defamation

■ Johnson alleges that FedEx defamed her when, in opposing her claim for

---

16. Vastrick Aff. ¶ 2.

unemployment benefits, it told the Alabama Department of Industrial Relations that she was fired for threatening FedEx supervisors. Though the First Amendment does not protect malicious falsehoods, or false statements about private figures in private matters, the legislature is free to abolish the common law tort of defamation. Alabama law provides that "all" communications from an employer to ADIR "*shall* be *absolutely privileged* and *shall not* be made the subject matter or basis for *any* civil action for slander or libel in *any* court." ALA. CODE § 25–4–116 (1975) (emphasis supplied). Despite this unambiguous language, the Supreme Court of Alabama has deliberately avoided ruling whether the privilege is qualified or absolute. *See Cantrell v. North River Homes, Inc.*, 628 So.2d 551, 554 (Ala.1993) (citing *Cole v. Cooper*, 437 So.2d 1257, 1258 (Ala.1983)). Such indecision chills free speech. The court has no trouble finding that the statute means what it says: the privilege is absolute. Count Three is due to be dismissed.

### *2. False imprisonment*

■ Johnson also alleges that she was falsely imprisoned when FedEx security questioned her about her involvement with the anonymous letters. In December 1999, while she was on paid suspension, FedEx asked Johnson to return to work in uniform. When she arrived, two security guards escorted her to a conference room with glass windows. Other employees passing by saw Johnson and shot her dirty looks while she answered questions for 7½ hours. Security followed her to the restroom, let her call her husband and an attorney only in their presence, and told her that the interrogation would stop if she confessed to writing the letters. Johnson told security that she needed to pick up her daughter from school, but FedEx would not let her leave. She says, "I asked would I be allowed to leave, and they said when they finished questioning me." Johnson's daughter ended up walking home in the rain to an empty house.[17]

■■ Under Alabama law, false imprisonment consists of "some direct restraint of the person" either through the express or implicit threat of force. *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1001 (Ala.1993) (interpreting ALA. CODE § 6–5–170 (1975)). At minimum, a plaintiff must request or attempt to leave the confined area. *See Williams v. Wal–Mart Stores, Inc.*, 2000 WL 1367977 at *3 (S.D.Ala.2000); *Uphaus v. Charter Hosp. of Mobile*, 582 So.2d 1140, 1142 (Ala.Civ.App.1991). Whether FedEx falsely imprisoned Johnson is a question of fact.

### *3. Outrage*

■ Johnson's final claim is that her firing, combined with the above-mentioned interrogation, was outrageous conduct. The court disagrees. Actionable conduct must go beyond all bounds of decency and, basically, bring tears to the eyes of a thick-skinned person. *See Durham v. Philippou*, 968 F.Supp. 648, 659 (M.D.Ala.1997). FedEx's conduct is not actionable. There is no evidence that Johnson's child suffered injury walking home from school, and the main effect on Johnson was that she wound up talking about the incident with her sister, who has a psychology degree. Services were rendered gratis. Count Four is due to be dismissed.

## VI. ORDER

It is CONSIDERED and ORDERED that Defendant's Motion For Summary Judgment be and the same is hereby DENIED as to Count Two of Plaintiff's

---

**17.** Mot. at 21; Resp. at 33–34; Johnson's Dep. at 153.

Amended Complaint and GRANTED in all other respects.