In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-1689

ROBERT DRIEBEL, JOHNNY SGRIGNUOLI,
STEPHEN PINCHARD, and BRETT HUSTON,

*Plaintiffs-Appellants,*

*v.*

CITY OF MILWAUKEE, MILWAUKEE POLICE DEP'T,
and CHIEF OF POLICE ARTHUR L. JONES,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 0301—**Patricia J. Gorence**, *Magistrate Judge.*

ARGUED OCTOBER 31, 2001—DECIDED JULY 29, 2002

Before BAUER, COFFEY and DIANE P. WOOD, *Circuit Judges.*

COFFEY, *Circuit Judge.* Appellants Robert J. Driebel, Johnny C. Sgrignuoli, Stephen Pinchard, and Brett Huston are police officers for the City of Milwaukee Police Department ("MPD" or "the Department"). The officers claim that their Fourth Amendment rights were violated when they were ordered by superior officers to remain on duty

or to accompany detectives to the headquarters of the MPD's Internal Affairs Division and answer questions put to them during the course of criminal investigations of their activity while on duty in January and February 1998. The magistrate judge presiding with the consent of the parties, 28 U.S.C. § 636(c), granted the Department's motion for summary judgment. Each of the officers appeal. We affirm the magistrate's decision to grant summary judgment in favor of the MPD and against Officers Driebel, Huston, and Pinchard. Driebel was seized based on probable cause and Huston and Pinchard never were seized. We reverse and remand as to Officer Sgrignuoli because we are convinced that a reasonable jury could conclude that he was seized without probable cause.

## I.

## A.

### 1.

On February 20, 1998, Officer Driebel was assigned to plainclothes duty during a daytime patrol shift from 7 a.m. to 3 p.m. At approximately 1:15 p.m., the MPD received an emergency call from the principal of Humboldt Park Elementary School in the City of Milwaukee, Wis., alleging that an "older kid" was "across the street bothering kids at the school."

Officer Driebel and his partner, Officer Karla M. Lehmann, were dispatched to the scene and, upon arrival, commenced their investigation with the taking of a statement from the principal. She told them that two or more teenage boys not enrolled in the school sauntered onto the playground, approached a group of fifth-grade girls and directed foul, vulgar, and obscene words and gestures at

them, with the boys grabbing their own genitals and so forth. The principal stated that when she went to the playground to investigate this harassment, the boys darted off across the street and into a house located at 3302 S. Adams St.

After obtaining this information, Driebel and Lehmann returned to their squad car, drove to the referred-to house, and knocked on the front door. No one answered. Driebel and Lehmann returned to the school and interviewed several boys at the playground who reportedly had witnessed the incident. (The boys interviewed were later identified as William Ryan, Craig Wood, Michael Mazur and Sabian Yunct). After taking statements from these four youths, Driebel and Lehmann returned to 3302 S. Adams St. and proceeded to monitor the residence and attempt to stop and interview any persons who might exit the house matching the suspects' descriptions.

After several minutes, two boys matching the descriptions walked out of the rear door of the house and entered into an adjoining alley. Driebel proceeded to follow the youths and pulled his squad car into the alley, and as the boys observed the police vehicle, they took off running in opposite directions. Driebel and Lehmann chose to pursue the boy later identified as Joshua Schmidt. Driebel remained in the squad car, while Lehmann exited the vehicle and chased Schmidt as he ran through several backyards in an attempt to avoid apprehension. After Lehmann lost sight of the boy, Driebel happened to observe him scampering across the playground towards an alley. Driebel drove around the school and down the alley, where he saw Schmidt lying prone on the ground in an attempt to hide from the police. At this point in the chase, Driebel stopped the car, exited the vehicle, and yelled, "Police! Are you tired of all this running shit? Just

stop!" Schmidt disregarded Driebel's lawful command and jumped up and vaulted over a fence in a second attempt to elude the pursuing officer. After chasing Schmidt through three or four yards, Driebel grew tired and realized that he was not going to be able to apprehend the fleeing youth. Out of frustration and in an attempt to stop Schmidt, Driebel threw his MPD-issued radio at the boy, inadvertently striking him in the head. Schmidt seemed unfazed; he kept running and neither stopped nor fell nor gave any indication of injury. After approximately twenty minutes of additional search activity, Driebel and Lehmann returned to their squad car and drove off without the suspects.

Once the officers had departed, Schmidt reemerged from his hiding place and returned to the playground where Mazur, Ryan, and Wood were still playing basketball. Schmidt at this time complained that he felt dizzy, laid down in the grass, and began to regurgitate. After several minutes, the youths called Wood's father, Robert. Mr. Wood drove to the school, observed Schmidt's injuries, conveyed him to the Second District police station, and proceeded to file an incident report concerning this matter.

**2.**

Mr. Wood spoke with Sgt. Thomas Doehling, who was assigned to handling citizen's complaints. During an interview, Schmidt informed Doehling that he was hit by something thrown by a police officer, adding that the officer declared, "I'm tired of chasing you, bitch!" before doing so. Mr. Wood reported that he was told by the children that someone who appeared to be a plainclothes officer was observed throwing a brick-like object at Schmidt and striking him from the rear on the head at the base of the

skull just above the neckline. Sgt. Doehling—after observing that Schmidt had blood on the back of his head and in his hair, as well as on the collar of his jacket—arranged for an ambulance to transport Schmidt to a nearby hospital for treatment and proceeded with the investigation by soliciting information from the Woods regarding the incident.

Mr. Wood's son, Craig, repeated the statement that he saw someone who he believed to be a police officer chase Schmidt and throw a brick-shaped object in Schmidt's direction. Mr. Wood added that he lived near the Humboldt Park school and was home earlier that afternoon and observed a man and a woman dressed in plain clothes speaking with the boys playing basketball. He further stated that he saw this same man walking around inside the police station and mingling with the other patrolmen on duty. Based on these statements, as well as his knowledge that Driebel had been dispatched to the Humboldt Park area earlier in the afternoon, Doehling suspected that Patrolman Driebel was probably the individual who threw the brick-shaped object.

Upon completing his interview of the Woods, Doehling sought out and located Driebel, whose shift terminated at 3 p.m. Doehling ordered Driebel to "stand by" in the police garage until given further instructions by a superior officer. Driebel complied with the order and commenced a waiting game in the garage for approximately four hours. He received overtime pay for this unusual assignment and retained possession of his I.D. card, badge, and all of his police-issued equipment. No one was assigned to monitor his presence in the garage, and there is no evidence that Driebel was isolated or prevented from communicating with anyone in the garage during this time.

**3.**

Meanwhile, at about 3:15 p.m., Sgt. Doehling contacted the Internal Affairs Division ("IAD") Criminal Investigation Unit and notified the IAD about the complaint. The matter was referred to Deputy Insp. Dale T. Schunk, who directed Lt. David Bruess to supervise an investigation and determine whether Driebel's conduct constituted a violation of any statutes or ordinances. Pursuant to the MPD's internal rule regarding use-of-force investigations, Schunk informed Chief of Police Arthur L. Jones of the investigation concerning the two officers who had chased a juvenile on the street and allegedly "threw a brick" and injured him during the pursuit. Jones ordered Insp. Schunk to report back to him concerning further developments in the investigation.

Bruess found it necessary to assign four other IAD detectives and order that they accompany him to the Humboldt Park area to question any possible witnesses concerning Schmidt's truancy, obscene gestures, and foul language. The detectives spoke to Robert and Craig Wood and to the three children previously seen at the playground—Mazur, Yunct, and Ryan. Bruess directed the detectives to separate the witnesses, take their statements, and investigate the scene of the incident. Robert Wood repeated his earlier statement that he observed a male chasing Schmidt. Wood added that his son, Craig, told him that he saw this same man throw a brick at "a kid." Mazur and Yunct reported that they saw Schmidt being chased by a male who they believed was a police officer. Ryan similarly reported that he saw a male chase Schmidt and throw an object at him; he also heard something hit a house almost instantly after the object was thrown.

Once Det. Kenneth Morrow received this information, he proceeded to examine residences within the 3200

block of South Adams and discovered a dent in the siding of one of the structures. The occupant of the house stated that she saw two men running through her yard and heard a loud thump against the residence at approximately 2 p.m., which is about the time when Driebel would have been chasing Schmidt. The detectives thereafter determined that the dent in the siding matched the shape of a battery used to power MPD-issued radios.

Some time between 4:15 and 5:30 p.m., the three investigating detectives relayed the results of their investigations to Bruess. Bruess concluded that Driebel had thrown his police radio at Schmidt. Bruess further concluded that he had probable cause to believe that Driebel committed "substantial battery"—a Class E felony under Wisconsin law. Bruess reached this conclusion based on the fact that: (1) the victim received an injury of such magnitude that he required conveyance and treatment at a hospital, where he was diagnosed as having suffered two lacerations to the scalp area requiring six sutures; (2) no evidence suggested that Driebel was acting in self-defense; and (3) police officers are not trained to throw their radios at suspects. Bruess further was troubled by the fact that Driebel violated MPD policy by failing to report any use of force in the line of duty to his supervisor as soon as possible, notwithstanding that Driebel was ordered to "stand by" in the police garage merely 45 minutes after the incident occurred.[1] *MPD Manual* § 2/455.00 (1994 & 2000

---

[1] Driebel states that until the time he was formally arrested for substantial battery, he had no knowledge that he was being investigated for the use of force. This statement is consistent with the fact that, when he was interviewed as part of an internal investigation several days after his arrest, Driebel stated that

(continued...)

Supp.).[2] Thus, Bruess somehow came to the conclusion that Driebel was attempting to conceal what he knew was the excessive use of force in the apprehension of a juvenile suspected of disorderly conduct and truancy.[3]

---

(...continued)

Schmidt appeared not to be fazed, displayed no sign of injury, kept running, and was not later observed by the officer as having injuries. Driebel further explained that he did not believe that the act of throwing a police radio at a fleeing suspect amounted to a use of force under Department guidelines, considering that the youth appeared not to be injured.

[2] The parties placed sections of the *MPD Manual of Rules and Regulations*, but not all of it, into the record before the magistrate judge. Courts may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED. R. EVID. 201(b). The *MPD Manual* contains the rules and regulations duly promulgated by the chief of police, effective as of August 1994 upon approval by the Common Council of the City of Milwaukee and published for use in the normal course of business by the Milwaukee Police Department. Thus, we may take judicial notice of any portions of the manual that are relevant to our analysis. *See United States v. Harris*, 271 F.3d 690, 694 n.3 (7th Cir. 2001); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

[3] In his deposition, Bruess stated: "*I determined from the act of throwing what I believe at the time was a radio at the kid that would—that would show your intent. It's like if you shoot somebody, your intent is to kill them. Why else would you shoot them?*" (Bruess's Dep. at 56-58.) Thus, Bruess obviously believes from the content of his statement regarding the intent requirement that regardless of where a shot is aimed and whether the bullet strikes someone in the leg, the foot, the ankle, the head, or anywhere

(continued...)

At 6:15 p.m., Bruess informed Schunk of the facts, and Schunk in turn advised Chief Jones of the results of the investigation, including Bruess's belief that probable cause existed to arrest Driebel for substantial battery—a Class E felony. Although the investigators failed to speak with either Driebel or his partner, Lehmann, Jones reflected upon the information and concluded that Driebel was not trying to stop Schmidt but intended to injure Schmidt because Driebel was not acting in self defense when he violated MPD policy and threw his radio at Schmidt. Relying on the quantum of information known to him, Jones believed that he had sufficient evidence to justify the arrest of any citizen for substantial battery and thus gave the order to arrest Driebel for substantial battery at approximately 6:30 p.m.

Thereafter, Driebel, who had been "standing by" in the Second District garage for approximately four hours, was summoned to the captain's office and placed under formal arrest. Without extending Driebel the opportunity to pro-

---

(...continued)

else; or whether the shooter aims his weapon at the lowest extremity of another person's body, the shooter should be charged with attempted murder, for, according to Bruess, the firing of the weapon fits the statutory requirement of intent *per se*.

We disagree with Bruess's interpretation of the law, for it is contradicted by the very language of the Wisconsin Supreme Court's ruling in *Smith v. State*, 230 N.W.2d 858 (Wis. 1975), where the Court stated in a murder case: "One is presumed to intend the natural and probable consequences of pointing and discharging a gun *at a vital part* of another's body." *Id.* at 862. Furthermore, when interviewed during an internal investigation a few days later, Driebel explained that he "tossed the radio at Schmidt's back with the intent of getting him to stop or slow down"—*not to injure him*.

vide a more complete account of that afternoon's incident by presenting his side of the story after consultation with a union representative or an attorney, Driebel was ordered to surrender all his police-issued equipment, gun, badge, locker room keys, identification card, etc. He was told that he was the subject of a criminal investigation and was read his *Miranda* rights. After refusing to make any statements to the detectives, Driebel was held and conveyed to the Milwaukee County Jail where he was booked, charged, and required to post a $500 bond before his release from custody several hours later.

Subsequent events strongly suggest that the officials and superior officers of the MPD overreacted by arresting and charging Driebel with substantial battery. After the case was referred to the Milwaukee County District Attorney's office at a later date for independent review, Deputy Dist. Atty. Jon N. Reddin, in the exercise of his discretion, refused to press charges for substantial battery or any other offense.[4] Reddin refused to charge Driebel and persuasively explained that he would have had difficulty satisfying the *intent* requirement of the statute, for after reviewing all of the evidence obtained in an independent investigation, he was convinced that Driebel threw the radio out of frustration without the requisite intent to harm the

---

[4] In Wisconsin, the district attorney's office is entrusted to use its "independent judgment and discretion" in determining whether to prosecute any given case. *City of Janesville v. Wiskia*, 293 N.W.2d 522, 526 (Wis. 1980). "There is no obligation or duty upon a district attorney to prosecute all complaints that may be filed with him. While it is his duty to prosecute criminals . . . this does not per se require prosecution in all cases where there appears to be a violation of the law no matter how trivial." *Id.* at 525. It is apparent from his refusal to prosecute Officer Driebel that Deputy Dist. Atty. Reddin was of the opinion that Driebel's actions could not have amounted to anything more than a "trivial" violation of the law, if even a violation at all.

fleeing suspect. However, the Department subsequently saw fit to suspend Driebel for twenty days without pay for violating MPD policy by using force against a civilian and failing to report the use of force to supervisors as soon as possible. The record fails to reflect whether Driebel took advantage of proceeding to an administrative hearing prior to being placed on suspension.

## B.

### 1.

Officers Huston, Sgrignuoli and Pinchard were each assigned to the Gang Crimes Division of the MPD. Documents reflect that while Huston and Pinchard were on duty January 21, 1998, they made a traffic stop of a vehicle for failing to stop at a traffic signal. One of the four passengers in the vehicle was a Latino male named Miguel Ramos, a convicted felon who police knew to have affiliations with the Latin Kings street gang.

On January 23, MPD Asst. Chief Paul Koleas telephoned Deputy Insp. Schunk with information that might have suggested that the officers committed a crime at the time of the Ramos traffic stop. Specifically, Koleas advised Schunk that he learned from a confidential informant that two officers had recently pulled over a vehicle with four male occupants, observed marijuana lying on the ground next to the car, and allegedly threatened to arrest one of the occupants for drug possession unless the occupant agreed to obtain a single handgun for them from off the street. That same day, the IAD was informed that gang member Ramos filed a complaint against two officers for their conduct on January 21, making the same allegations as those to which the confidential informant had alluded. Ramos alleged that the officers followed him to a friend's house to get a gun, but that Ramos allegedly was unable to produce a gun once he got there. Ramos added that

at this point, the police took $30 from him and instructed him to page them and bring them not one but two guns the next day, or else he would be arrested and charged with possession of drugs. Ramos alleged, "The police told me, 'Your price of freedom now went to two guns.'"

After reviewing police activity records for the evening shift of January 21, the IAD concluded that Officers Huston and Pinchard were involved in the Ramos traffic stop. Ramos further informed the IAD detectives that Huston paged him several times on January 22, leaving the Gang Crimes Division phone number on each occasion. At this point, the IAD launched a criminal investigation to ascertain whether Huston or Pinchard might be guilty of the crime of misconduct in public office.

During the next several days, the IAD interviewed three individuals who had been referred to them by Ramos. It is unclear from the record whether these individuals were also gang members. They stated that Ramos came to them looking for a gun, explaining that he had been threatened with arrest if he did not obtain the weapon for the police. One witness further stated that two officers came to her residence several times over the course of a two-day period checking to see if Ramos had dropped off a gun. Another witness added that Ramos complained to her that the police took $30 from him.

Either Schunk or Koleas advised Chief Jones about Ramos's complaint as well as the information they had gathered during their week-long investigation. Jones was of the opinion that if the patrolmen had committed the acts as alleged by Ramos, then probable cause would exist to believe that they were guilty of misconduct in public office. At this time, Jones ordered a sting operation be set up to test the veracity of Ramos's claims and placed Bruess in charge of the undercover investigation.

**2.**

Bruess arranged for the sting to occur in the early evening hours of January 29, 1998. On this date, Officers Huston, Pinchard, and a third officer, Johnny Sgrignuoli, were working the 5 p.m. to 1 a.m. shift on Milwaukee's south side. Huston was working patrol detail in the same squad car as Sgrignuoli, and Officer Pinchard was attending a training session at District One headquarters. As part of the sting, Jones directed Bruess to place two handguns in a dumpster on the corner of South 14th and West Mitchell. Contemporaneously therewith, Bruess planted a hidden camera in nearby bushes in order that they might monitor any activity possibly transpiring with respect to the planted weapons.

At the instruction of the IAD, Ramos telephoned Huston and advised him that there were two guns in a dumpster on the corner of South 14th and West Mitchell. After receiving this information, Huston and Sgrignuoli proceeded to drive to the designated location to secure the planted weapons. Sgrignuoli exited the squad car, retrieved the firearms, and placed them in the back end of the police vehicle. Upon observing this activity, two unmarked police vehicles pulled up and stopped their squad cars behind Huston and Sgrignuoli's. Det. Lawrence Ciske and Det. Louis Johnson exited their vehicles and, according to Huston, immediately "separated" him from Sgrignuoli. The manner by which the patrolmen were "separated" is not explained in the record.

**a.**

Sgrignuoli recognized Det. Ciske as he exited the unmarked car, and as Sgrignuoli approached the detective, he asked, "What's going on?" Ciske refused to respond and "turned [Sgrignuoli] around and directed him back toward his squad car." As the two men began walking toward

the car together, Ciske informed Sgrignuoli that he was the subject of a criminal investigation and ordered him to enter the vehicle.

Det. Johnson thereafter approached Officer Sgrignuoli as Det. Ciske walked back to his own vehicle. Johnson sat down in the front passenger seat of Sgrignuoli's squad car, and Sgrignuoli occupied the driver's side of the vehicle. Johnson instructed Sgrignuoli to drive to the IAD offices at police headquarters in downtown Milwaukee. While on their journey, Sgrignuoli asked Johnson several times, "What is going on here?" but Johnson refused to answer and stated that he could not say. At one point during the trip, Sgrignuoli was radioed by his supervising sergeant, but Johnson ordered Sgrignuoli neither to respond nor advise the sergeant of his location.

The supervisor of the sting operation, Lt. Bruess, later testified that Officer Sgrignuoli's name "*never came up in the investigation*" of Ramos's incident report and that Sgrignuoli "*wasn't involved at all*" in the matters about which Ramos complained. Bruess said that Officer Sgrignuoli was detained simply because he "just happened to be unlucky enough to be partnered up with Brett Huston" on the date of the sting. *Bruess also acknowledged that he neither informed Sgrignuoli that the sting operation was focusing on Huston's and Pinchard's conduct nor that Sgrignuoli was being transported to headquarters along with Huston in an effort to avoid giving Huston any indication that he might be the subject of a criminal investigation.*

Upon their arrival at the police administration building, Johnson and Sgrignuoli entered the IAD offices located on the third floor in a room that is inaccessible to the general public and is relatively isolated from other parts of the headquarters. Johnson directed Sgrignuoli to enter the room and shut the door behind them. The record fails to disclose whether the door was locked. On at least one

occasion, Johnson continued to refuse to answer any of Sgrignuoli's questions about why he had been taken out of duty and ordered to report to the IAD's office.

Sgrignuoli and Johnson remained in the room together for several hours. Eventually, two other IAD detectives entered the room and read Sgrignuoli his *Miranda* rights. Sgrignuoli immediately demanded legal counsel, and the two detectives exited the room, leaving Sgrignuoli alone with Johnson once again. After approximately thirty minutes, Schunk and three other IAD officers came into the room and informed Sgrignuoli that he was now under investigation for MPD rule violations rather than any criminal activity, despite Lt. Bruess's later admission in his deposition that he knew Sgrignuoli "wasn't involved at all" in the matters about which Ramos complained. Thereafter, Sgrignuoli was directed to leave the office and return to duty with the Gang Squad, but he requested to take the rest of the evening off and the request was granted.

Sgrignuoli was paid for the hours he worked that day, including the time he spent cooling his heels in the IAD offices at the direction of a lieutenant who was fully aware that Sgrignuoli's conduct was in compliance at all times with all state statutes, local ordinances, and rules of the Department. It is interesting to note that Sgrignuoli never was charged with any crime or rule violation, nor placed on administrative suspension for his conduct, nor penalized for any of his actions taken on the night in question.

**b.**

We now retrace our steps to the time when Det. Ciske first came in contact with Sgrignuoli and Huston at the corner of South 14th and West Mitchell. After speaking with Officer Sgrignuoli, Ciske ordered Huston to accompany him to the IAD office. The record is barren of any evidence

that Ciske ever laid his hands on Huston. The two men walked to Ciske's undercover car, and Ciske sat in the driver's seat while Huston sat in the passenger's seat on their trip to headquarters. During the drive, Ciske advised Huston that he had been ordered to pick up Huston and bring him downtown. Huston, like Sgrignuoli, was escorted to an empty room at the IAD's headquarters, where the two of them whiled away their time occupying a room on the third floor of the building, sitting alongside each other for approximately three hours. Even after advising Huston that he was the subject of a criminal investigation, Ciske refused to allow Huston to call an attorney or a union representative, despite Huston's multiple requests. There is no additional evidence in this underdeveloped record explaining what the two men discussed, if anything, while they were in each other's presence at the IAD headquarters. Likewise, this sparse record fails to explain, for purposes of evaluating whether Huston was seized, whether the door to the IAD office room was open or closed, locked or unlocked during this time.

We do know that Huston was refused permission to use the restroom unless he was accompanied by at least one detective, who positioned himself outside of the restroom door. Huston did concede that the detectives may have followed him in order to attempt to monitor whether he attempted to talk to other officers about matters related to the Ramos complaint. We also point out that MPD's superior officers may not use physical force to detain a patrolman unless they are placing the patrolman under arrest or if he is fleeing from custody. Furthermore, although Huston might very well have been subject to discharge or some other adverse employment action had he seen fit to leave the IAD headquarters without permission, Huston like the other appellants, did receive compensation for his duty hours that day. Huston never was relieved of the possession of his police-issued credentials

and weapons, including his gun, I.D. card, badge, and other police-issued essentials while he waited in the IAD headquarters.

After approximately three hours, an IAD detective entered the room and read Huston his *Miranda* rights. Huston immediately requested an attorney and a union representative and declined to make any statements outside of the presence of the attorney. At this point, the detectives changed their course and decided to convert the investigation from a criminal inquiry to an internal inquiry of whether Huston, like Officer Sgrignuoli, had committed any violation of MPD rules and regulations.[5] Several minutes thereafter, Huston was instructed to report back to the Gang Squad for the remaining two hours of his shift.[6]

---

[5] An allegation of a rules violation, obviously, is not as serious as an allegation of criminal activity. There also is at least one more important distinction between a criminal investigation and an internal investigation: information obtained during a criminal investigation may be used to support criminal charges and adverse employment decisions. However, as we explain *post* at 22-23 n.8, information obtained during an internal investigation may not be used in a criminal prosecution of the individual being questioned unless he has waived his Fifth Amendment rights. It is for this reason that many public agencies conduct a criminal investigation prior to opening an internal investigation.

[6] We note that Section 3/450.05D.8 of the *MPD Manual* provides: "In investigations that require an immediate interview, the [officer] will be allowed a reasonable opportunity to obtain the presence of and to consult with a representative of his/her choice before and during the interview. . . . If any member being interviewed by a supervisory officer requests representation, and that representation is denied, the supervisory officer shall prepare an ''In the Matter of' Report' indicating the circumstances which led up to the request for representation and the reason why representation was denied." Huston did not argue in the trial

(continued...)

Huston never was arrested, for when Deputy Dist. Atty. Reddin was asked for his opinion, he advised Chief Jones that he would exercise his discretion and refuse to prosecute Huston because even if Reddin disagreed with Huston's judgment and methods, Reddin believed that Huston was acting in good faith in the performance of his duties as a member of the Milwaukee Police Department. Furthermore, for reasons the Department has not explained, no disciplinary charges ever were brought against Huston. Surprisingly, within two years after this investigation, he was given a promotion to the rank of detective.

**c.**

There is a sparsity of information in the record detailing the MPD's investigation or the official adjudication of Officer Pinchard's alleged misconduct. Although Huston and Pinchard had been working as partners on the nights of January 21 and 22, 1998, Pinchard was working alone, without a partner, on the evening of January 29, when he was ordered by a lieutenant of the Gang Crimes Intelligence Unit to report to the IAD. It is relevant to the question of seizure that Pinchard was allowed to walk to his

---

(...continued)
court that the detectives attempted to question him after abandoning their criminal investigation and initiating an internal investigation for the alleged violation of department rules, and thus we need not consider whether such questioning would have been proper. *Cf. DOJ v. FLRA*, 266 F.3d 1228 (D.C. Cir. 2001). Additionally, because this underdeveloped record fails to establish that Huston was taken into custody, *post* at 38-43, we need not discuss the consequences of the Department's refusal to permit Huston to consult with an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

squad car and drive himself to the police headquarters some time between 6 and 7:30 p.m. Upon arrival, Pinchard proceeded to the third floor of the building as ordered and was escorted into an empty room. Almost immediately after he entered the conference room, Pinchard was read his *Miranda* rights by two detectives and thereafter exercised his right to remain silent. Pinchard remained in the room for thirty minutes; it is unknown whether he was alone or with an IAD detective during this time. He was then instructed to return to the Gang Squad in order to complete the remainder of his shift.

Pinchard does not allege that he was touched by any detective, nor that he would have been physically restrained if he failed to report to the IAD headquarters or thereafter attempted to leave headquarters.

## II.

Each officer charges that his respective rights were violated by the Milwaukee Police Department when he was allegedly seized without probable cause in violation of the Fourth Amendment as incorporated against the states by the Fourteenth Amendment. We review a grant of summary judgment *de novo*, considering all of the available affidavits, depositions, transcripts, and exhibits in the light most favorable to the non-moving party. We affirm a grant of summary judgment if there is insufficient evidence for a rational jury to find in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986).

## III.

Prior to the events in this lawsuit, Chief of Police Arthur L. Jones issued an order that once an officer has become the subject of a criminal investigation, MPD detectives are

to question the officer about his or her alleged misconduct. The investigating detectives, in their discretion, may choose to interrogate the officer at his or her normal work station or at some other suitable location, including the IAD headquarters. An officer who disobeys a superior officer's order to accompany the detective to headquarters is subject to: (1) being terminated or suspended for insubordination; or (2) being conveyed to a suitable location for questioning.

The district court ruled that each of the alleged seizures was reasonable but never did identify at what particular time any of the alleged seizures may possibly have taken place. Chief Jones argues that the relevant case law does not clearly answer the question of whether the Fourth Amendment's prohibition against unreasonable seizures is implicated when he orders his officers to remain on duty, accompany detectives to the Department's headquarters, and either answer questions about their alleged misconduct or invoke their Fifth Amendment rights to silence. Thus, Jones states that he is entitled to qualified immunity on all of the charges against him.

Several months after the trial judge's ruling, the Supreme Court reiterated in *Saucier v. Katz* that:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the [official's] conduct violated a constitutional right? This must be the initial inquiry. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.

121 S.Ct. 2151, 2155-56 (2001).

Thus, in light of the *Saucier* decision, we must determine whether, and at what point, actions initiated by the

Department against its on-duty police officers during a criminal investigation should be classified as unreasonable seizures in violation of the officers' Fourth Amendment rights. "Conducting such an analysis complies with the *Saucier* Court's ultimate goal of establishing legal principles that remove uncertainty in the case law, guiding public officials in their daily conduct, and protecting all but the plainly incompetent or those who knowingly break the law from future nettlesome lawsuits." *McNair v. Coffey*, 279 F.3d 463, 474 (7th Cir. 2002) (Coffey, J., concurring).[7]

## IV.

### A.

We begin our analysis by stating the well-settled rule that men and women do not surrender their freedoms when joining the police force. "*[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.*" *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). At the same time, we hasten to emphasize that nothing in the Fourth Amendment endows public employees with greater workplace rights than those enjoyed by their counterparts in the private sector. Thus, in cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state. *See Lefkowitz v. Cunningham*, 431 U.S. 801 (1977); *Uniformed Sanitation Men Ass'n v. Commissioner*, 392 U.S. 280 (1968); *Gardner v. Broderick*, 392 U.S. 273 (1968); *Garrity*, 385 U.S. 493; *Atwell v. Lisle Park Dist.*, 286 F.3d 987 (7th Cir. 2002); *Confederation of Police v. Conlisk*, 489 F.2d 891 (7th Cir. 1973).

---

[7] We wish to make clear that Judge Coffey neither knows nor is related to Officer Sean Coffey, the defendant in *McNair v. Coffey*.

We have previously commented that "[a] trustworthy police force is a precondition of minimal social stability in our imperfect society," *Shields v. Burge*, 874 F.2d 1201, 1204 (7th Cir. 1988), and that "[t]he public, including fellow law enforcement agents, expects that police officers will not violate the laws they are charged with enforcing." *United States v. Lamb*, 6 F.3d 415, 419 (7th Cir. 1993). As this record makes clear, certain command officers within the MPD seem to engage in a systematic pattern of making officers feel unnecessarily uncomfortable when the Department sets about to conduct internal criminal investigations. However, having made this comment, we wish to make clear that with respect to how the Milwaukee Police Department treats its officers as employees, the federal courts do not intend to act as super-personnel boards and that *the judiciary "should defer, whenever possible consistent with the Constitution, to the superior expertise of law enforcement professionals in dealing with their respective personnel." Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 975 (7th Cir. 2000).

We hold that the Department has the authority to direct its officers to remain on duty or to accompany detectives to the Department's headquarters and either answer questions from supervisory officers as part of a criminal investigation about their alleged misconduct or invoke their Fifth Amendment rights against self-incrimination.[8] We

---

[8] Of course, questioning as part of a criminal investigation implicates the officer's Fifth Amendment right to counsel and right against self-incrimination, as enunciated in *Garrity* and its progeny. We have interpreted *Garrity* to mean that the Government "has every right to investigate allegations of misconduct, including criminal misconduct by its employees, and even to force them to answer questions pertinent to the investigation, but if it does

(continued...)

reject the appellant officers' argument that a patrolman is seized, within the meaning of the Fourth Amendment, at the time that he is ordered to report for questioning at a designated, centralized area, such as the headquarters for the internal affairs department (wherever it may be located) or some other suitable location determined by the superior officer. *See Attreau v. Morris*, 357 F.2d 871, 875 (7th Cir. 1966) (Knoch, J., dissenting); *see also United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam) (no seizure when on-duty civilian Air Force employee was ordered to report for interview with intelligence officer); *United States v. Baird*, 851 F.2d 376, 380-82 (D.C. Cir. 1988) (same in case involving on-duty Coast Guard officer).

A police department is a paramilitary organization that must maintain the highest degree of discipline, confidentiality, efficiency, and espirit de corps among its officers, who are the first line of defense against lawlessness. In all paramilitary organizations, there are rules that must be followed. The plaintiffs in this case, like all other officers who have accepted employment with the Milwaukee Police Department, agreed as part of their terms and conditions of employment to "promptly obey any lawful order

---

(...continued)

that it must give them immunity from criminal prosecution on the basis of their answers." *Atwell*, 286 F.3d at 990. Furthermore, any Government employer "who wants to ask an employee potentially incriminating questions must first *warn* him that because of the immunity to which [case law] entitles him, he may not refuse to answer the questions on the ground that the answers may incriminate him." *Id.*

In this case, the record does not indicate whether the detectives ever advised the appellants of their *Garrity* rights. We need not consider the implications of this fact, however, since the officers did not allege any Fifth Amendment violations.

emanating from any officer of higher rank," *MPD Manual* § 2/030.00, to be "always subject to orders from proper authority and to call from civilians," *id.* § 2/025.00, to "be always subject to duty although periodically relieved from the routine performance of it," *id.*, and to "obey all orders issued by supervisors assigned to the Internal Affairs Division pertaining to a personnel investigation." *Id.* § 3/450.00D. The officers further agreed that the IAD detectives in the factual situation before us do have the power and authority to "immediately" interview them when reviewing a "complaint of delinquency or misconduct on the part of a member of the Department." *Id.* §§ 2/700.10, 450.05D.8.

Thus, within the limits set by *Atwell*, *Garrity*, and their progeny, if an officer declines to cooperate with an investigation or refuses to obey a lawful command by a superior officer to report for questioning at Department headquarters, he exposes himself to the same potential consequences as an employee in the private sphere: suspension, termination, or other work-related discipline, such as being placed on administrative leave pending an investigation of the charges against him. *See*, *e.g.*, *Johnson v. FedEx Corp.*, 147 F. Supp.2d 1268, 1277 (M.D. Ala. 2001).

Having reached this conclusion, we also want to emphasize that public employees, including police officers, are entitled to equal protection of their rights under the law. *Thus, we reject the Department's argument that it may seize an officer without probable cause who refuses to obey a command to remain on duty or report to a particular location in order to answer questions as part of a criminal investigation.* Rather, the Department's options are somewhat limited when dealing with an officer who has disobeyed a lawful order from his superior officers. First, the Department may institute investigative proceedings that may very well result in the dismissal, suspension, or discipline of the officer. *Sanitation Men*, 392 U.S. at 285.

This includes placing him on administrative leave while conducting a further investigation. *See id.* Second, the Department may briefly stop, frisk, and question the officer consistently with the holding of *Terry v. Ohio*, 392 U.S. 1 (1968), provided that the Department adheres to the well-settled rule of law that if a *Terry* stop continues too long or becomes unreasonably intrusive, it ripens into a *de facto* arrest that must be based on probable cause. *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). Third, the Department may seize, arrest, and detain the officer for custodial interrogation, *provided that the arrest is supported by probable cause. Cerrone v. Brown*, 246 F.3d 194, 199-202 (2d Cir. 2001); *see also* 2 I. SILVER, PUBLIC EMPLOYEE DISCHARGE & DISCIPLINE § 14.01[D] at 989 (2001). *Cf. United States v. Taketa*, 923 F.2d 665, 675 (9th Cir. 1991); *LAPPL v. Gates*, 907 F.2d 879, 886 (9th Cir. 1990).

**B.**

*We emphasize the probable cause requirement because the MPD contends that it may seize and interrogate its officers for any reason upon a showing of less than probable cause merely by showing that the seizure was reasonably justified at its inception, reasonable in scope, and otherwise reasonable under the circumstances.* The Department supports this position by citing us to cases involving the Fourth Amendment's application to *internal investigations* designed to discover evidence of work-related misconduct, rather than *criminal investigations* conducted with prosecution in mind. We conclude that the cases cited by the Department, such as *O'Connor v. Ortega*, 480 U.S. 709 (1987), *Shields*, 874 F.2d at 1203-07, and *Lowe v. City of Macon*, 720 F. Supp. 994 (M.D. Ga. 1989), are distinguishable because, as the Department concedes, each of the four policemen in this case were advised at one time or another that

they were criminal suspects who were questioned with an eye towards criminal prosecution.[9]

Instead, the facts of this case are materially similar to *Cerrone*, wherein the Second Circuit held that an officer cannot be seized *without probable cause* during a criminal investigation. "[A] lesser standard of individualized suspicion is permissible only in internal disciplinary investigations of government employees by their government employers." *Cerrone*, 246 F.3d at 201. Thus, the Second Circuit concluded that a police officer's rights were violated when he was seized, detained and questioned by several detectives regarding the suspected cover-up of a hit-and-run accident—all without probable cause. *Id.* at 196. *See also Taketa*, 923 F.2d at 675 (ruling that public employer may not "avoid the probable cause requirement when it is acquiring evidence for a criminal prosecution.").

Since police "are not relegated to a watered-down version of constitutional rights," *Garrity*, 385 U.S. at 500, we agree with the Second Circuit and hold that a law enforcement agency needs probable cause to seize its employees as part

---

[9] The determination of whether an officer has been seized for the purpose of a criminal or an administrative investigation should focus on the totality of the circumstances, including: (1) the nature of the encounter, its setting, and its preparation; (2) whether the police department followed the applicable collective bargaining agreement's provisions for administrative investigations; and (3) the statements made by the questioning detectives. *See Cerrone*, 246 F.3d at 201. The inquiry is an objective one, asking whether a reasonable person in the position of the officers would believe he was the subject of a criminal or an administrative investigation by the department. *See id.*

of a criminal investigation.[10] *See Dunaway v. New York*, 442 U.S. 200, 214 (1979); *Davis v. Mississippi*, 394 U.S. 721, 726-27 (1969).

## V.

The issue, then, becomes whether the appellant MPD patrolmen herein were seized without the existence of probable cause. Officer Driebel argues that he was seized when he was commanded to "stand by" and remain on duty at the District Two police station while IAD detectives investigated the citizen complaint filed against him. Officers Sgrignuoli, Pinchard, and Huston argue that they were seized when they were accosted and ordered to report to the IAD headquarters in furtherance of the detectives' investigation of public misconduct.

We explain below that Officers Huston and Pinchard were never seized, and Officer Driebel was lawfully seized with probable cause. On the other hand, Officer Sgrignuoli was unlawfully seized without probable cause.

---

[10] A private sector employee is falsely imprisoned during an internal investigation if his or her liberty is restrained through the threat or use of force. *See*, *e.g.*, *Dupler v. Seubert*, 230 N.W.2d 626 (Wis. 1975); WIS. STAT. § 940.30. Because the issue is not raised in this case, we need not determine whether a police officer can state a false imprisonment claim if he happens to be denied his freedom of movement by superior officers conducting an internal investigation. *Cf. Tomrell v. Leavenworth County*, 845 F. Supp. 1454, 1458 (D. Kan. 1994) (granting summary judgment on claim of false imprisonment absent proof that sheriff's deputies confined patrolman's freedom of movement during two-hour investigation of possible misconduct).

**A.**

To support their claims, the officers rely principally on the recent case of *Grow v. City of Milwaukee*, 84 F. Supp.2d 990 (E.D. Wis. 2000), where the district court concluded that several MPD officers were seized when they were threatened with job loss for failing to comply with an order to accompany police supervisors to police headquarters and submit to a blood-alcohol test. *Id.* at 1001-02. The *Grow* court determined that patrolmen who are ordered to follow supervisors to a given location may be seized even if they are "threatened only with job loss and not physical force" *id.* at 1001, since, according to the district judge, "all that is necessary to effectuate a seizure is a 'show of authority' which in some way restrains the liberty of a citizen." *Id.* at 1002 (quoting *Terry* 392 U.S. at 19 n.16).

Notwithstanding the district judge's quotation from *Terry*, we are convinced that the judge's analysis improperly truncates the holding of the Supreme Court's more recent decision in *United States v. Mendenhall,* 446 U.S. 544 (1980), where the Court defined the test for a seizure as follows: "*A person has been 'seized' within the meaning of the Fourth Amendment only if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave*." *Id.* at 554. The district court also failed to discuss, much less even cite the Court's decision in *INS v. Delgado*, 466 U.S. 210 (1984), where the Court explained that no restriction on an employee's freedom of movement may be attributed to police agents, for purposes of evaluating whether the employee was seized, unless "the agents' conduct" gave the employees "'reason to believe that they would be detained'" even "'if they gave truthful answers to the questions put to them or if they simply refused to answer.'" *Florida v. Bostick*, 501 U.S. 429, 436 (1991) (quoting *Delgado*, 466 U.S. at 218).

*Delgado* involved a Fourth Amendment challenge to the INS's practice of visiting factories and, with the consent of the employer, questioning workers randomly to determine whether any of them were illegal aliens. In *Delgado*, several INS agents stood near the factory exits while other agents traveled through the plant questioning workers. The employees argued that they were seized, because they were of the belief that they would have been terminated had they left their worksite in order to avoid speaking with the INS agents. The Court rejected this reasoning and explained that the restriction on the employees' movement could not be attributed to the police because "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Delgado*, 466 U.S. at 218. Thus, the Court concluded that "there was no seizure because, even though the workers were not free to leave the building without being questioned, the agents' conduct should have given employees 'no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer.'" *Bostick*, 501 U.S. at 436 (quoting *Delgado*, 466 U.S. at 218).

We believe that the plaintiffs' reliance on *Grow* is misplaced, for *Grow* fails to acknowledge that police officers: (1) may reasonably believe, based upon their workplace obligations to comply with department's guidelines and regulations, that their *employment relationship* will be severed if they refuse or disobey an order, direction, or request to accompany detectives to the department's headquarters; but (2) lack any reasonable basis to feel that they will be *restricted by force or a show of lawful authority in their freedom of movement or their ability to terminate the encounter*.

*Delgado*, *Broderick* and *Sanitation Men* dictate that *the possibility or even probability of a future adverse em-*

*ployment action—as opposed to physical detention—cannot enter our analysis of whether the officers in this case were seized.* A seizure occurs only when a person submits to the show of lawful authority or the application of physical force by an officer acting in the role of a law enforcement agent rather than as a public employer or supervisor. *See California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). The "physical force or show of authority" must be something more than a threat to terminate the patrolman if he refuses to comply with a commanding officer's order to accompany a detective to a central location and answer questions as part of a criminal investigation. *See Fournier v. Richardson*, 160 F.3d 754, 757 (1st Cir. 1998) (holding that it was irrelevant for Fourth Amendment purposes that a corrections officer allowed himself to be handcuffed during a training exercise because he feared that refusal would have resulted in "negative consequences for his continued employment"); *see also Muegge*, 225 F.3d at 1270; *Baird*, 851 F.2d at 380-82. Since the Fourth Amendment does not protect against the threat of job loss, the relevant constitutional inquiry must focus on whether reasonable people in the position of the subordinate officers would have feared *seizure or detention* if they had refused to obey the commands given by their superior officers. *See Delgado*, 466 U.S. at 218. *Cf. Miraliakbari v. Pennicooke*, 561 S.E.2d 483, 489 (Ga. App. Ct. 2002) (rejecting employee's argument that "the threat of loss of a job constitutes sufficient force or fear to form the basis of a claim for false imprisonment."); *Hannah v. Marshall Field & Co.*, 665 N.E.2d 343, 349 (Ill. App. Ct. 1996) (same); *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 77-78 (Mass. 1987) (same). We thus disagree with the *Grow* court's statement concluding that patrolmen are considered to be seized if they are "threatened only with job loss and not physical force" and a detention of some type. 84 F. Supp.2d at 1001.

## B.

### 1.

With the foregoing principles in mind, we address the Fourth Amendment claims of each officer, beginning with Officer Driebel. Driebel argues that he was seized at approximately 3:15 p.m. on February 20, 1998, when he was ordered to work overtime and "stand by" for 3½ hours in the police garage at the Second District police station. The record fails to support this claim, for there is no evidence suggesting that he would have been prevented from leaving the garage had he refused to obey Sgt. Doehling's command to remain on "stand by" duty.

Driebel, who was not under formal arrest at the time, must have been aware that no officer was permitted to use force or any show of authority to prevent him from departing the garage if he so chose. Furthermore, Driebel received overtime pay and retained possession of all his police-issued equipment, including his gun, police identification card, badge, and locker room keys while he was standing around in the garage for 3½ hours. There is no evidence that the MPD created a coercive environment by, for example, isolating and preventing Driebel from speaking with anybody who may have been present in the garage, advising Driebel that he was the subject of a criminal investigation, or reading Driebel his *Miranda* warnings prior to the time he was relieved of duty. Thus, on the basis of this record, we refuse to hold that Driebel was seized by Doehling's orders, given in accordance with the *MPD Manual* § 2/025.00, to stand by and remain on duty. *See Fournier*, 160 F.3d at 757; *see also Muegge*, 225 F.3d at 1270; *Baird*, 851 F.2d at 380-82.

There is no dispute, however, that Driebel was seized at the time of his formal arrest, when he was advised of his rights, taken into custody, stripped of all his police

equipment (gun, I.D., etc.), booked, and ordered to post a $500 bond as a condition of release. Thus, we proceed in our Fourth Amendment analysis by explaining in the following section that his seizure was supported by probable cause.

**2.**

There is probable cause to arrest if the totality of the facts and circumstances known to a reasonable arresting officer would support the belief that the suspect has committed or is committing a crime. *Marshall v. Teske*, 284 F.3d 765, 770 (7th Cir. 2002); *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). The court must consider the facts as they would have reasonably appeared to the arresting officer "seeing what he saw, hearing what he heard" at the time of the incident. *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988). An officer's belief in the existence of probable cause "*need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.*" *Woods*, 234 F.3d at 996. Furthermore, "we have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause." *Id.*

Driebel contends that if the Department had postponed its decision to arrest him until it had completed its investigation over the course of the several days following the incident—*as an assistant district attorney stated in her deposition is the usual procedure in cases like the one before us, involving MPD officers who are residents of the city and neither are considered to be a flight risk nor pose a threat to the community*—it in all likelihood would have discovered additional evidence proving that his use of force was reasonable under the circumstances and that he lacked the intent to cause bodily harm. Driebel thus argues that it was unlawful for Chief Jones to order his arrest prior

to pursuing its regular avenues of investigation. Although it would have been prudent for the Department to have conducted a more thorough investigation (we elaborate upon this point *post* at 35-37 n.13), we cannot agree with Driebel's interpretation of the law, for it is well-settled that once detectives *have performed a good-faith investigation and assembled sufficient information from the totality of the circumstances to establish probable cause, they are not required under the Constitution to continue searching for additional evidence.* "This is true even if sound police technique would have required such further investigation." *Id.*

Moreover, there is no Fourth Amendment violation so long as the officers had probable cause "to arrest the suspect either for the precise offense the officers cited or for a closely related charge." *Williams v. Jaglowski,* 269 F.3d 778, 783 (7th Cir. 2001). In order to rely on the "closely-related charge" doctrine:

> the officers must show that the charge can reasonably be based on the same set of facts that give rise to the arrest and that the charge offered as justification is one that would have recommended itself to a reasonable police officer acting in good faith at the time the arrest was made. The justification for the arrest cannot be an *ex post facto* extrapolation of all crimes that might have been charged on a given set of facts.

*Id.* (internal citations omitted); *see also Richardson*, 860 F.2d at 1430-31.

In this case, Driebel was arrested for violating WIS. STAT. § 940.19(2) as a result of his having committed an alleged act of substantial battery upon Schmidt. The statute provides that "[w]hoever causes *substantial bodily harm* to another by an act done with intent to cause bodily harm to that person or another is guilty of a Class E felony." Encompassed within *substantial battery* is the lesser-included crime of *simple battery*, which prohibits the infliction

of "*bodily harm* to another by an act done with intent to cause bodily harm." § 940.19(1). The difference between substantial and simple battery lies in the circumstances surrounding the incident and the gravity of the injury suffered by the victim.[11] Thus, as a matter of law, the crime of *substantial battery* is closely related to the crime of *simple battery*. § 939.66(2m).

A police officer may be guilty of committing a battery by using unreasonable force in the apprehension of a suspect. *State v. Mendoza*, 258 N.W.2d 260, 273-74 (Wis. 1977); *Wirsing v. Krzeminski*, 213 N.W.2d 37 (Wis. 1973). Driebel argues that the Department lacked probable cause to believe that he injured or used force with an intent to cause bodily harm to Schmidt, rather than merely apprehend him. We disagree, for we are convinced that the Department conducted a legally adequate inquiry by interviewing the victim, Joshua Schmidt, as well as numerous witnesses who gave sufficient corroborating testimony to establish that Driebel may have committed a battery when he threw his radio at Schmidt's back and struck him at the base of the skull area.

Under Wisconsin law, an actor is presumed to intend the consequences of his knowingly and voluntarily performed acts. *Rabideau v. City of Racine*, 627 N.W.2d 795, 803 (Wis. 2001). Chief Jones and Lt. Bruess believed that Driebel acted with an intent to harm Schmidt because they *could not conceive of a legitimate law enforcement reason for throwing a radio at a fleeing juvenile suspect.*

---

[11] "Bodily harm" is defined as "physical pain or injury, illness, or any impairment of physical condition." WIS. STAT. § 939.22(4). The modifier "substantial" implies that "substantial bodily harm" must consist of substantial physical pain or injury, substantial illness, or substantial impairment of physical condition. 1 HAMMER & DONOHOO, SUBSTANTIVE CRIMINAL LAW IN WISCONSIN §§ 411-14 (1988).

In support of his position, Jones stated during his deposition that "we don't train officers to throw radios and hit people." Jones added that although Driebel's acts constituted the use of physical force under MPD policy, Driebel failed to comply with the requirement that all patrolmen must report their use of force to a superior officer at the earliest possible time thereafter.[12] Jones explained that he was of the opinion—based upon his years of training and experience as a departmental supervisor—that an officer is less likely to report the use of force if he has acted improperly rather than for legitimate law enforcement purposes. Jones added that none of the witnesses to the incident stated that Driebel was acting in self-defense. Accordingly, Jones stated that he presumed Driebel intended the natural consequences of his act, *i.e.*, intended to harm the juvenile truant and harasser when he threw the radio and struck him.

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 148-49 (1972). Based on the facts known to Jones at the time of the arrest, supported with the statements of several witnesses ruling out the possibility of self-defense, we believe there was sufficient evidence to establish probable cause that the officer committed the crime of battery.[13]

---

[12] Indeed, at a subsequent administrative hearing a police review board deemed Driebel's violation of the use-of-force policy to be severe enough to warrant a 20-day suspension without pay. Driebel never has challenged the review board's determination.

[13] This was a close question. Even though we hold that Chief Jones's decision to arrest, charge, and book Officer Driebel was lawful, this is not to say from the facts and circumstances in this record that it was an exercise of good judgment.

(continued...)

(...continued)

As explained above and also in Part I.A, Driebel's arrest was handled in an unusual manner. The Department ordered Driebel to stand around in the garage for almost four hours without any explanation as to why he was being detained, much less how long he might be detained. Jones testified in his deposition that he believed Driebel's use of force was unreasonable primarily because he thought Driebel was chasing Schmidt for the non-violent offense of truancy. (Jones claims to have been unaware that Schmidt also allegedly harassed a group of schoolchildren earlier in the day). However, neither Jones nor his aides ever saw fit to obtain any statements from either Schmidt or Driebel's partner about whether Driebel's pursuit of the suspect through alleyways and backyards may have turned obstructive at any time or might have resulted in possible misadventure or violence that could possibly have justified throwing a radio in order to prevent escape.

*In addition, and in contrast to how Officers Huston, Pinchard, and Sgrignuoli were treated, Asst. Dist. Atty. Marcella DePeters testified that the Department deviated from local custom by formally arresting, booking, and detaining Driebel without first consulting the district attorney's office. The record reflects that, unless there is reason to believe that an officer is a threat to the public or plans to flee the jurisdiction, MPD officials meet with the district attorney and inquire whether the prosecutor acting independently is likely to press charges against the officer. An arrest is rarely made unless charges are likely to be brought. Deputy Dist. Atty. Reddin, after conducting an independent and thorough investigation, refused to press charges because he concluded that Driebel's discretionary use of force was reasonable. Even Lt. Bruess—who supervised the investigation—felt that Driebel's discretionary use of force in the situation facing him was not improper to the degree that he should have been charged with a crime. (Doc. No. 61 ¶ 184.)*

*We have difficulty conceiving why the chief of police ordered the arrest and booking of this duly-sworn police officer under*

(continued...)

*See Spiegel v. Cortese*, 196 F.3d 717, 723-24 (7th Cir. 1999). "That is enough to support the district court's conclusion that [Driebel] suffered no deprivation of [his] federal rights when he was arrested." *Williams*, 269 F.3d at 784-85.


## C.

We need not elaborate in great detail upon Officer Pinchard's claim, for it received little attention in the briefs or at oral arguments. After Pinchard was ordered by a lieutenant to report to the IAD, he was allowed to drive himself unaccompanied in his own squad car to police headquarters. He was met at the IAD offices by detectives and escorted to a conference room, where he waited for approximately thirty minutes before being read his *Miranda* rights and refusing to make a statement. We do not know from this meager record whether Pinchard was advised about the pending criminal investigation. Nor do we know whether he was touched by any detec-

---

(...continued)

*these circumstances, thereby exposing the officer and his family to abject rumor, scorn, and disgrace, when there was substantial doubt as to whether he would be prosecuted for committing the crime charged.* Commanding officers who are entitled to demand and expect the respect of the beat patrol officer must earn that respect by treating each and every officer like a professional at all times. We cannot say that respect was paid here. Thus, although we hold that the MPD technically had probable cause to arrest, we question whether Chief Jones and the battery of officers and detectives under his supervision advanced the interests of public safety when they saw fit to bypass the independent prosecutor. Nevertheless, for the reasons explained above, we agree with the magistrate's decision to grant the Department's motion for summary judgment. *See McNair*, 279 F.3d at 467 (noting that "the Constitution does not displace state and local governments as the source of wise police practices").

tive, threatened with physical restraint, placed in a locked or unlocked room, or forced to submit to surveillance by overbearing detectives. Indeed, immediately after Pinchard refused to speak with the detectives, he was instructed to return to the Gang Crimes Division and complete the remainder of his shift. On these facts presented, and for the reasons expressed in Part III.B.1, we conclude that Pinchard's claim of seizure is without merit.

### D.

Officer Huston argues that he was seized beginning at the time when the IAD detectives approached him and his partner, Officer Sgrignuoli, and ordered them to report to the Department's headquarters. Huston further claims that this custodial seizure continued in effect until such time as he was released and ordered to return to duty several hours later. This sparse and undeveloped record is barren of key facts to support the essential elements of Huston's Fourth Amendment claim. Thus, *on the basis of this skeletal record,* we conclude that Officer Huston's seizure claim must fail. Yet we wish to make clear that this is a close call even on the basis of the meager record before us, and we stress that officers with a more complete record in future cases might very well avoid the entry of summary judgment against them.

### 1.

As part of the sting operation, two detectives approached Huston while he was searching for guns planted in a dumpster on the corner of South 14th and West Mitchell on Milwaukee's south side. At the time he was instructed to accompany IAD detectives to Department headquarters, Officer Huston was on duty and was obligated to perform any lawful task to which he was assigned. There is no

evidence that the detectives made a display of their weapons, spoke in a menacing manner, made coercive statements, or informed Huston that he was under arrest. It is undisputed that Huston remained in possession of all of his MPD-issued equipment, weapons, and identification at all times.

As we explained in more detail *ante* at 28-30, a seizure occurs when one's freedom of movement is terminated by the submission to a show of lawful authority or the application of physical force by officers acting in their capacity as law enforcement agents. *See Hodari D.*, 499 U.S. at 626-27. It should be noted that Officer Huston was not some naïve, awestruck individual confronting the police for the first time. Rather, he was a sworn, highly trained law enforcement officer, who, we believe, was well aware of his constitutional and workplace rights.[14] Furthermore, as we have emphasized throughout this opinion, Huston and every other appellant accepted as a condition of employment that any IAD detective was vested with the power and authority to "immediately" interview them at a suitable place as part of an inquiry into any "complaint of delinquency or misconduct." *MPD Manual* §§ 2/700.10, 450.05D. Moreover, Huston was aware that force could not be used to require him to submit to an interview or prevent him from departing from the scene unless he was formally arrested.

Huston does not state that he was touched or forcibly moved by any detective. He does assert in a conclusory fashion that the detectives "placed us under arrest I believe," but the record is barren of concrete facts to sup-

---

[14] Section 2/010.00 of the *MPD Manual* provides that: "All members of the Department shall familiarize themselves with all the provisions of the Department's Rules and Procedures Manual within 30 days of the issuance thereof."

port this opinion. The failure to produce objective evidence in response to the Department's motion for summary judgment is fatal to Huston's claim, for it is clear that incidental physical contact between individuals and officers is insufficient to establish a seizure. *See Delgado*, 466 U.S. at 220; *United States v. Boone*, 67 F.3d 76, 78 (5th Cir. 1995).

We are convinced that a reasonable officer in Huston's position would have believed—based on his experience and understanding of the law and MPD policy—that the detectives were ordering him to report to the Department headquarters. However, the distressingly few facts set forth in this "bare bones" record fail to support a reasonable belief that the detectives would have compelled Huston to leave the scene of South 14th and West Mitchell against his will. *See United States v. Watson*, 423 U.S. 411, 424-25 (1976); *United States v. Rice*, 995 F.2d 719, 724 (7th Cir. 1993); *Baird*, 851 F.2d at 381-82; *State v. Connor*, 861 P.2d 1212 (Idaho 1993); *see also Delgado*, 466 U.S. at 220-21 ("While persons who attempted to flee or evade the agents may eventually have been detained for questioning, respondents did not do so and were not in fact detained . . . . Respondents may only litigate what happened to them. . . ."). Accordingly, based upon this record, we hold that Huston has failed to produce anything but unsupported assertions—rather than objective evidence—to support an allegation that he was seized during his initial encounter with the IAD. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

### 2.

Similarly, we have been unable to find anything in this record that would suggest that Huston was seized dur-

ing the time he remained at the IAD's downtown headquarters for questioning pursuant to orders. Huston has not claimed that he was physically restrained at any time between when he began the trip to the IAD headquarters and when he was directed to return to his regular patrol shift later that evening. Nor has Huston placed into this record any evidence that the doors to the conference room were locked. Nor does Huston allege that he was refused permission or told he would be detained if he left the IAD headquarters.

The record does establish that after being advised he was under a criminal investigation and read his *Miranda* rights, Huston was denied his request to contact a union representative or an attorney and ordered to remain in a room located in a somewhat remote, isolated location at police headquarters on the third floor in an area with very little foot traffic. These facts are indicative of a coercive encounter. However, Huston was never informed that he was the suspect for any particular crime, nor was he spoken to in a menacing or threatening manner. Quite the contrary: we are told that Huston and Det. Ciske sat together in silence for approximately three hours. Furthermore, it is undisputed that Chief Jones requires that any and all officers must be read their rights prior to any type of questioning by detectives, even as part of an internal investigation. Thus, under these circumstances, we believe that "the mere giving of such warnings does not transform noncustodial questioning into nonconsensual custodial interrogation." *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996).

One circumstance that is very troubling is that Huston was not permitted to use the restroom without the accompaniment to and fro by at least one detective standing outside of the restroom door. But at the same time, we must remember that: (1) Huston retained possession over his MPD-issued weapons, identification cards, badges, and

locker room keys while he was waiting at the IAD headquarters and using the restroom; (2) Huston was compensated for his time spent at headquarters; and (3) Huston produced nothing more than a conclusory assertion that officers are accompanied to the restroom only when they are being held in custody. The fact that Huston was never physically restrained and was permitted to retain his departmentally-issued weapons, identification, and property negates the inference that he was seized, especially when we recognize the contrasting treatment of Officer Driebel, who was ordered to turn in all of his police-issued paraphernalia after being formally arrested.

Courts have properly denied summary judgment motions in seizure or false imprisonment cases when plaintiffs were escorted to and from the restroom by a police detective waiting outside the restroom door. *See*, *e.g.*, *Johnson*, 147 F. Supp.2d at 1277; *Angara v. City of Chicago*, 897 F. Supp. 355, 358 (N.D. Ill. 1995). However, we are more reluctant to infer seizure in a similar situation when the plaintiff is a police officer and the police department articulates a legitimate reason for following the officer. Law enforcement agencies are entitled to deference, within reason, in the execution of policies and administrative practices that are designed to preserve and maintain security, confidentiality, internal order, and esprit de corps among their employees. *See Kelly v. Johnson*, 425 U.S. 238, 246 (1976); *Kuchenreuther*, 221 F.3d at 975; *Bruer v. Hart*, 909 F.2d 1035, 1041 (7th Cir. 1990); *Egger v. Phillips*, 710 F.2d 292, 325 (7th Cir. 1983) (en banc) (Coffey, J., concurring). Huston concedes that he may have been followed to the restroom because the Department understandably wished to observe whether he was leaving the conference room in order to communicate with other officers about the ongoing investigation, perhaps by phoning the officers or encountering them at headquarters directly. Although we might well have reached a dif-

ferent conclusion if we had the benefit of a more complete record, we conclude based on the facts before us that a reasonable officer would have believed that Huston was being followed so that his activities could be monitored rather than for purposes of detention. *See Palmer v. City of Chicago*, 755 F.2d 560, 578 (7th Cir. 1985) ("The Federal courts have no business whatsoever meddling in or attempting to control the daily maintenance and administration of the [MPD] . . . absent a clear and defined constitutional violation.").

Thus, we repeat that a reasonable observer might conclude from this record that Huston would have been terminated, suspended, or disciplined if he refused to cooperate with the IAD detectives.[15] However, for the reasons expressed above, we hold that this record fails to establish that Huston was deprived of the opportunity to avoid seizure by terminating his encounter with the police.[16] *See Fournier*, 160 F.3d at 757.

---

[15] It is interesting to note, however, that two years after this investigation by six commanding officers failed to produce any evidence that Officer Huston violated any statute, ordinance, or departmental rule, *Huston was promoted to the rank of detective.*

[16] We emphasize again that this record case is poorly developed. We have no reason to decide, and thus do not mean to imply any view about whether the same result would follow if there had been evidence establishing, among other things, whether Huston was: (1) physically touched or "separated" from his partner; (2) placed in a locked room; (3) relieved of his weapons; (4) confronted by armed officers; (5) questioned by officers using a menacing tone of voice or making coercive statements; (6) explicitly denied a request to leave or told he was not free to leave; (7) treated in a manner that differs from standard MPD guidelines or customs for questioning police officers; or (8) accompanied to the restroom solely for purposes of harassment or when other officers would not have been so accompanied and watched.

**E.**

On the other hand, we are convinced that a rational jury might very well conclude that Officer Sgrignuoli, unlike Officer Huston, was seized by the detectives who accosted him at the corner of 14th and West Mitchell. Det. Ciske exerted physical force when "grabbing Sgrignuoli, turning him around and directing him back towards the squad car." By grabbing Sgrignuoli and "turning him around," Ciske restricted the officer's freedom of movement. Although the *MPD Manual* authorizes detectives to interview police officers who are suspects in criminal investigations, the same manual forbids superior officers from using force to subdue the officer and effectuate the interview. Based upon this conduct and other evidence recounted herein, a jury could find that a reasonable officer would have believed that Sgrignuoli faced detention rather than merely the pains of a future adverse employment action had he refused to comply with the order. *Cerrone*, 246 F.3d at 199-203.

Because Officer Sgrignuoli was seized, the next question we ask is whether the seizure was supported by probable cause. The Department's attorneys argue, in direct contradiction to Lt. Bruess's statements discussed below, that it had reason to believe that Sgrignuoli had committed misconduct in public office, which occurs if a public employee "exercises a discretionary power in a manner inconsistent with the duties of the officer's or employee's office or employment or the rights of others and with intent to obtain a dishonest advantage . . . .". WIS. STAT. § 946.12(3). A police officer violates the statute by threatening another person with extortion, *Hanley v. State*, 104 N.W. 57 (Wis. 1905), or by planting evidence on someone in order to effectuate an unlawful arrest. *Cf. State v. Schmit*, 340 N.W.2d 752 (Wis. Ct. App. 1983).

We have set forth the law of probable cause in Part V.B.2 and see no need to repeat that discussion here. We add

only that because "the overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State," *McNair*, 279 F.3d at 486 (Coffey, J., concurring), the police must pursue reasonable avenues of investigation and have "more than a bare suspicion" that criminal activity is afoot prior to effectuating a seizure. *Woods*, 234 F.3d at 996.

The facts viewed most favorably to Sgrignuoli—as they must be at this stage of the proceedings—establish that *neither Chief Jones nor his subordinate superior officers had evidence that Sgrignuoli was guilty of committing any type of misconduct in public office or violating any other statute, ordinance, or rule and regulation of the MPD. Indeed, Jones's personally-selected officer in charge of the sting operation, Lt. Bruess, admitted that the decision to detain and question Sgrignuoli was made despite the fact that: (1) Sgrignuoli's "name never came up in the [Department's] investigation" of the Ramos incident; (2) Sgrignuoli "wasn't involved at all" in the incident; and (3) Sgrignuoli was seized only because he "happened to be unlucky enough to be partnered up with Brett Huston" on the day of the sting.*[17]

---

[17] In response to questions from Plaintiffs' counsel about Ramos's allegations of a shakedown and IAD's investigation of Sgrignuoli's involvement with the events of January 21-28, 1998, Bruess responded as follows:

Q: Okay.

A: We didn't know about Sgrignuoli at the time [of the sting], though. *His name never came up in the investigation, I don't believe.*

Q: Do you know what Sgrignuoli's involvement in the situation was?

A: *He just happened to be working with Huston in the office that day when the call came in. He wasn't involved at all.*

(continued...)

The Department's investigation revealed that Officers Huston and Pinchard—not Sgrignuoli—were the two patrolmen who were present on the scene and allegedly took $30 from gang member Ramos as part of a shakedown on January 21, 1998. These officers—not Sgrignuoli—also allegedly threatened to unlawfully arrest Ramos for drug possession unless he obtained two guns for them. Indeed, the IAD detectives learned that Huston or Pinchard—not Sgrignuoli—proceeded to page Ramos several times the next day and even stop by his home several times to inquire about the gun. Two additional witnesses stated that they observed Ramos paging the police and allegedly speaking with an "Officer Huston," but there is no evidence that Officer Sgrignuoli's name was ever mentioned by these witnesses.

The Department does not contend that Sgrignuoli had any contact with Ramos at any time. On the evening of the previously-discussed sting operation, which was designed primarily to see how Huston would react if Ramos contacted them and stated he had the guns that Huston previously requested, Jones directed Bruess to place two handguns inside a dumpster on the corner of South 14th and West Mitchell. Bruess also planted a hidden camera in some nearby bushes, in order to monitor any activity that might transpire with respect to the weapons. At the instruction of the IAD, Ramos telephoned Huston some time after 5 p.m. and advised Huston that he had placed two guns in a dumpster at 1438 W. Mitchell. After receiving this phone call, Huston proceeded to drive to

---

(...continued)

Q:  So he just happened to be unlucky enough to be partnered up with Brett Huston on that day?

A:  Correct.

(Bruess's Dep. at 106.)

the location to pick up the planted firearms, while accompanied by Patrolman Sgrignuoli as his assigned partner that day.

Sgrignuoli exited the squad car, retrieved the planted weapons, and placed them in the car. The Department concedes that Officer Sgrignuoli would have been subject to discipline (on the grounds of recklessly jeopardizing public safety) had he refused to retrieve the guns that he had been directed to secure from a dumpster in a residential neighborhood.[18] But the Department has failed to produce any evidence that Sgrignuoli had any knowledge or information concerning Huston's alleged threat to arrest Ramos and the alleged demand for $30. Thus, the Department had no reason to believe that Sgrignuoli may have suspected that Huston was involved in questionable tactics designed to get guns off the streets.

"The concept of guilt by association is repugnant to our notion of elemental justice and fair play." *United States v. Swayne*, 700 F.2d 467, 469-70 (8th Cir. 1983). The facts viewed in a light most favorable to Sgrignuoli establish that his seizure was attributable entirely to guilt by association: he "happened to be partnered up with Brett

---

[18] Bruess was questioned in his deposition as follows:

Q: Now, as far as an officer, when he gets a phone call from a known gang member that he's got guns in a trash dumpster at some location on the south side, what is that officer's responsibility in regard to retrieving those guns?

A: *He's got to go get them or he's got to send somebody else to do it.*

Q: Why is that?

A: *You can't leave guns sitting in there.* Someone else is going to find them.

(*Id.* at 105.)

Huston" on the day of the sting. These facts demonstrate that Chief Jones and his officers assigned to assist with this case lacked probable cause—or even arguable probable cause—to order the seizure and detention of Officer Sgrignuoli for committing misconduct in public office. *See Marshall*, 284 F.3d at 771-72; *BeVier v. Hucal*, 806 F.2d 123, 127-28 (7th Cir. 1986); *Moore v. Marketplace Rest. Inc.*, 754 F.2d 1336, 1345-47 (7th Cir. 1985).

## VI.

Chief Jones argues that he is entitled to qualified immunity because he reasonably believed that it was lawful to detain a police officer under his command based on the lesser standard of reasonable suspicion rather than probable cause.[19] We are convinced that the *law was clearly established long before January 1998 that a law enforcement officer could not seize another officer as part of a criminal investigation without probable cause*. Thus, we reject Chief Jones's defense of qualified immunity.

"Qualified immunity shields from liability government officials who are performing discretionary functions in the course of duty to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Spiegel*, 196 F.3d at 723. "The law is 'clearly established' if 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001) (quoting *Saucier*, 121 S.Ct. at 2156).

---

[19] The facts in Part V.E strongly suggest that Jones lacked even reasonable suspicion to believe that Sgrignuoli had committed misconduct in public office.

The Supreme Court held more than thirty years ago that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights," *Garrity*, 385 U.S. at 500, and innumerable decisions rendered prior to January 1998 have clearly established the right to be free from arrest without probable cause. *See, e.g.*, *Dunaway*, 442 U.S. at 216; *Davis*, 394 U.S. at 726-28; *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995). Furthermore, it has been explicitly held *that as early as 1995* "*the law was clearly established that a seizure of a police officer in the context of a criminal investigation required probable cause.*" *Cerrone*, 246 F.3d at 196.

The Department attempts to distinguish the above-cited cases, but we have been unable to discover any case law that would justify a reasonable belief that an officer suspected of criminal misconduct may be *seized during a criminal investigation and detained for questioning* based on the reasonable suspicion standard. The two cases heavily relied upon by Chief Jones deal with detentions for *internal investigations, as opposed to criminal investigations*, and thus have no relevance to the situation before us. *Cf. Shields*, 874 F.2d at 1206-07 (holding that work-related investigatory search of officer's desk may be supported by reasonable suspicion; noting that employee did not argue that search was "part of any criminal investigation"); *Biehunik v. Felicetta*, 441 F.2d 228, 231 (2d Cir. 1971) (holding that police department could order employees to appear in police lineup intended for use in "administering disciplinary measures"; although information obtained might possibly be used in future prosecution, court expressly declined to consider "the propriety of enjoining a similar lineup conducted exclusively with criminal prosecution in mind").

The Fourth Amendment requires that the police establish probable cause prior to seizing an individual; any lesser quantum of proof has been permitted only on those

rare occasions "when 'special needs, *beyond the normal need for law enforcement,* [made] the warrant and proba-ble-cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judg-ment)). Accordingly, we hold that the law was clearly established, and Chief Jones should have known in Jan-uary 1998 that he needed *probable cause* rather than *reasonable suspicion* in order to seize and detain Officer Sgrignuoli for purposes of a criminal investigation. "Since Chief Jones allegedly ordered [the seizure of Sgrignuoli without probable cause], the defense of qualified immunity must fail as applied to him." *Delgado v. Jones*, 282 F.3d 511, 521 (7th Cir. 2002).

## VII.

The magistrate judge properly granted the defendants' motion for summary judgment with respect to the claims raised by Officers Driebel, Huston, and Pinchard, for Huston and Pinchard never were seized and Driebel was seized with probable cause. The judge erred, however, when granting summary judgment on the claim raised by Officer Sgrignuoli, for a reasonable jury might very well deter-mine that he was seized without a hint of probable cause.[20]

---

[20] For the reasons explained throughout this opinion, it is un-constitutional to seize a police officer, as part of a criminal in-vestigation, on anything less than a determination of probable cause. Because the district court erroneously granted summary judgment on the merits of Officer Sgrignuoli's claim, it had no occasion to consider whether liability may attach to the City of Milwaukee, pursuant to *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978). On remand, the court in all prob-ability will have to address the issue of municipal liability, keep-

(continued...)

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART. This case is REMANDED for further proceedings consistent with this opinion.

DIANE P. WOOD, *Circuit Judge,* concurring. I am happy to concur in my colleagues' judgment affirming the district court's grants of summary judgment in favor of the defendants with respect to the claims brought by Officers Driebel, Huston, and Pinchard. Based on the thorough review of the record that the majority has undertaken, I also concur in the judgment reversing the judgment in Officer Sgrignuoli's case and remanding for further proceedings. I write only to emphasize that I do so on the understanding that the comments made in the majority's opinion with respect to various facts pertaining to Officer Sgrignuoli's case, such as the knowledge of various members of the Police Department at various times and the circumstances surrounding his own conduct, refer only to the summary judgment record, where we are taking everything for present purposes in the light most favorable to the non-moving party. At trial, the defendants will naturally have an opportunity to contest those facts and have the trier of fact resolve all disputed issues.

---

(...continued)
ing in mind the City's admission that it has enforced an official policy of seizing and questioning its police officers based on *reasonable suspicion*, rather than the constitutionally mandated standard of *probable cause*. (Appellants' Br. at 27).

No. 01-1689

A true Copy:

  Teste:

       _____
       *Clerk of the United States Court of*
       *Appeals for the Seventh Circuit*